Filed 11/25/20  Madden v. City of Redwood City CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALISON MADDEN,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>CITY OF REDWOOD CITY et al.<br><br>  Defendants and Respondents. | A156288<br><br>(San Mateo County Super. Ct. No. 17CIV00316) |

In 2016, the City of Redwood City (City) settled a lawsuit challenging its operation of the Docktown Marina.  Pursuant to a settlement agreement in that litigation, the City adopted a plan for the termination of residential use of berths at the marina and provision of relocation assistance to displaced residents.  The present case challenges the settlement agreement and plan as beyond the authority of the City Council (Council).  After numerous rounds of demurrers and amendments of the complaint, the trial court denied further leave to amend and entered judgment for the City.  For the reasons explained in this opinion, we will affirm.

## BACKGROUND

Appellant Alison Madden resides on a houseboat (or "liveaboard") located at the Docktown Marina on Redwood Creek in Redwood City, under a lease with the City.  The residential community at Docktown was established by private operators pursuant to a revocable permit from the City, and the

1

City assumed operation in 2013, when the private operator terminated operations.

Docktown is located within an area granted to the City by the State of California, to hold in trust for the people of the state and use for specified public purposes. (Stats. 1945, ch. 1359 [granting "certain lands, salt marsh, tidelands, submerged lands"]; Stats. 1954, ch. 34 [amending chapter 1359].) Such land grants "remain subject to the public trust, and remain subject to the oversight authority of the state by and through the State Lands Commission." (Pub. Resources Code, § 6009, subd. (c).)

In 2014, the State Lands Commission (Commission) informed the City that the Docktown "residential floating home community" violated the terms of the granting statutes and was inconsistent with the common law public trust doctrine, noting that, based on advice from the Office of the Attorney General of California, Commission staff had consistently taken the position that "residential use of sovereign lands" was inconsistent with the public trust doctrine.

In June 2015, Deputy Attorney General Andrew Vogel responded to the Commission's request for "informal advice" on the legality of private residential use of houseboats at Docktown with a letter stating that such private residential use violates "the terms of the statutes by which the Legislature granted these tidelands in trust to the City and the common law public trust doctrine." This "Vogel letter" was subsequently provided by the Commission to the City.

In November 2015, Citizens for the Public Trust and Ted J. Hannig (Citizens/Hannig) filed suit against the City, alleging that the City's operation of Docktown violated the public trust doctrine and was causing financial and environmental harm. The parties entered into a settlement

2

agreement in January 2016, which provided, among other things, that "[a]bsent a superseding and publicly documented change in the Commission's policies, an opinion by the AG, and/or a superseding action by the Legislature, which allows residential use in Docktown, the City shall take formal action, no later than December 31, 2016, to adopt a Plan that will be in conformance with the Commission's policies concerning residential use of the public trust portion of Docktown and consistent with the AG's 6/9/15 Letter. By December 31, 2017, the City shall have undertaken its best efforts and action towards prompt implementation of the Plan." The settlement agreement provided for the City to create a "Docktown Fund" of $3,000,000 to address environmental and public trust issues, such as possible relocation assistance, and to pay Citizens/Hannig $1,500,000.

On December 12, 2016, the Council approved Resolution 15550, adopting the "Docktown Plan," directing the City Manager to terminate all "Live Aboard" rental agreements and authorizing the City Manager to take all actions necessary to implement the purposes of the Docktown Plan. The resolution's findings explain that the residential community at Docktown was established by private operators prior to the City assuming operation in 2013; the Commission had "made clear that private residential use of Docktown is inconsistent with the public trust doctrine"; the City had entered into a settlement agreement to resolve the Citizens/Hannig suit, which "requires the City to adopt a plan for Docktown that is in conformance with the [Commission's] determination that residential use of the public trust portion of Docktown does not comply with the public trust doctrine"; the cessation of residential use would require relocation of approximately 65 households, including many long-term residents; and the City desired to ensure a smooth transition for displaced residents by providing "a reasonable relocation

3

process and schedule, including the provision of relocation advisory assistance, and financial assistance, even though no state or federal law mandates such assistance."

On January 23, 2017, San Francisco Bay Marinas for All, Inc. (SFBM) filed the present taxpayers' action (Code Civ. Proc., § 526a)[1] against the City, Citizens/Hannig and Doe defendants to set aside the settlement agreement and for declaratory and injunctive relief. After introductory allegations including that the public trust area where Docktown is located was granted to the City as trustee by the Commission, the complaint alleged that the City lacked jurisdiction to enter the settlement agreement because the City charter vests exclusive control over the "Port Area," in which Docktown is located, in the Port Department (Port) and Board of Port Commissioners (Board), including exclusive power to sue and defend any action within the Port's jurisdiction and to enter contracts. It was alleged that the charter allows the Port to relinquish portions of the Port Area to the Council; the Port did so with areas including part of Docktown in the late 1950's and early 1960's; and the "City returned jurisdiction of all of Docktown to the Port in the '70's." It was further alleged that the liveaboards were permissible under the public trust doctrine because they did not interfere with public use of the tidelands or because of the public need for affordable housing.

SFBM filed a first amended complaint on February 14, 2017, followed by an unsuccessful ex parte application for an order to show cause for preliminary injunction.

The City and Citizens/Hannig filed demurrers, which the trial court overruled in part and in part sustained with leave to amend. The court found

---

[1] Further statutory references will be to the Code of Civil Procedure unless otherwise specified.

the allegations insufficient to establish taxpayer standing, as there was no allegation SFBM paid or was liable to pay a tax assessed by the City, and insufficient to challenge the City's discretionary decision to settle litigation under caselaw holding that a section 526a claim cannot be used to challenge a governmental entity's discretionary action absent allegations of fraud or collusion by the decision makers. As to the City's jurisdiction, the court held that because Public Resources Code section 6009.1, subdivision (c)(13), prohibited a trustee of public land from delegating its duties except by direct supervision, any transfer of jurisdiction from the City to the Port was either preempted by state law or subject to the City's direct supervision.[2] The court sustained the demurrer to the third cause of action for declaratory relief, which sought adjudication of Docktown residents' rights with respect to the Commission's interpretation of the public trust doctrine, for failure to join an indispensable party, the Commission.

On July 10, 2017, Madden joined SFBM as plaintiff in filing a second amended complaint against the City, Citizens/Hannig, again alleging that the City lacked jurisdiction to enter into the settlement agreement or Docktown Plan because the area within which Docktown is located is under the exclusive jurisdiction of the Port. On the same date, an amendment to the complaint was filed inserting the Commission in place of Doe 1. The City and Citizens/Hannig again demurred.

The trial court sustained the demurrers as to SFBM without leave to amend, again due to the absence of allegations this plaintiff paid or was liable to pay a tax assessed by the City. As to Madden, the court sustained

---

[2] The court found the evidence offered by the City inadequate to determine that the allegations concerning transfers of jurisdiction from the City to the Port were false, as the City maintained.

5

the demurrers with leave to amend. The court reiterated its conclusion that any transfer of jurisdiction over Docktown to the Port was necessarily either preempted by state law or subject to the City's direct supervision (Pub. Resources Code, § 6009.1, subd. (c)(13)) and noted that the second amended complaint contained no new allegations establishing a basis for finding the City acted unlawfully, but gave Madden an opportunity "to establish a basis by which either the Settlement Agreement or the Docktown Plan is the product of fraud or collusion or is unlawful."

On October 12, 2017, Madden, now acting in propria persona in place of the attorney who previously had represented her and SFBM, filed her third amended complaint against the City, Citizens/Hannig and Doe defendants.[3] This complaint added allegations that "Citizens for the Public Trust, the developer of the property across from Docktown, and former or current elected and/or appointed officials, agents, personnel and representatives of the City" colluded to bring about and settle the lawsuit by Citizens for the Public Trust "in order to set up the closure of Docktown and enrich Ted Hannig and his associated developer monied interests." Other new allegations included that "the Port Department 'is' the City of Redwood City, it has capacity (exclusive jurisdiction) over its Port Area and it acts 'as the City of Redwood City, by and through its Port Department" and that the Port "is not overseen by the City council or city Manager" and "is equal, and co-equal to the Council as 'the City of Redwood City.' "

Then, on January 18, 2018, Madden filed a motion for leave to file a fourth amended complaint, stating (among other things) that she was

---

[3] In a writ petition to this court, Madden stated that she substituted herself for former counsel to represent SFBM, as well as herself. To our knowledge, the only substitution of counsel form in the record is for Madden alone, not for SFBM.

required by the court's prior order to add the Commission as a converted Doe defendant. The proposed complaint alleged causes of action against the "City/Council/Port," Citizens/Hannig to "set aside agreements for violation of city charter," for declaratory relief against the City, Port, Does 2 to 100, and the Commission, and for declaratory relief against the Commission and Attorney General. Madden alleged the June 2015 letter from Deputy Attorney General Vogel to the Commission had been improperly characterized as an " 'official' Attorney General opinion" and this mischaracterization "drove the Hannig Suit and Settlement and is the foundational error on which all of the proceedings and proceedings have evolved." Madden added allegations of collusion between the City and " 'barge dwelling' owners" (as opposed to boat dwellers) "to loot the taxpayers of millions of dollars" before a trial court ruling on the merits of a CEQA lawsuit filed by SFBM (No. 17CIV00276). With respect to the jurisdiction issues, Madden alleged, "The Port was always trustee by virtue of City's 1929 Charter. As City's Charter created the Port Department before 1945, the Port is and always has been trustee of Granted Lands. The Charter is not a 'delegation' of duty. The Port and BOPC hold all legislative and other authority over Granted Lands *as* City. . . ."

The City and Citizens/Hannig filed demurrers to the third amended complaint, followed by oppositions to Madden's motion for leave to file a fourth amended complaint, which were consolidated for hearing on August 2, 2018.[4] In connection with overruling Madden's objections to assignment of

---

[4] The trial court proceedings were temporarily stayed pending our resolution of a writ petition Madden filed on February 27, 2018, challenging the dismissal of SFBM from the action and denial of the order to show cause re preliminary injunction and seeking peremptory disqualification of Judge

7

the case to the writs and injunction calendar, the court held that jury trials are not permitted in section 526a injunction proceedings. The court sustained the City's demurrer to the first and second causes of action of the third amended complaint with leave to amend "to allege, in a single cause of action brought pursuant to CCP 526a, each specific act by the City of Redwood City that is alleged to be unlawful and/or the product of collusion and each remedy sought including any injunctive or declaratory relief concerning each specific act alleged to be unlawful or the product of collusion." The court sustained the City's demurrer to the third cause of action for declaratory relief without leave to amend, stating that a request for declaratory relief "may not be brought with regard to the official actions of a public agency except in the context of a Taxpayer Action pursuant to CCP 526a such as that alleged in the First Cause of Action." The court denied Madden's motion for leave to file a fourth amended complaint without prejudice "to the right to seek leave to amend to allege specific causes of action against specific parties for specific relief that are appropriately joined to the instant action." The court explained that the proposed second and third causes of action "improperly join a variety of parties and claims only marginally related to the instant action and fail to establish a basis for relief against those parties" and contained no allegations establishing taxpayer standing with regard to the Attorney General, Commission, or Port, but that

---

Miram. We issued a temporary stay, then on May 30, 2018, denied the petition and dissolved the stay. The California Supreme Court denied Madden's petition for review on June 20, 2018.

8

the proposed first cause of action constituted a "successful offer of proof that allegations of collusion could be alleged. . . ."[5]

On July 26, 2018, Madden served the third amended complaint and a summons on the Commission, stating it was "sued herein as Doe 1."

Madden filed a fourth amended complaint on August 14, 2018, against the City "ex rel. its Council," the City "ex rel its Port Department and Board of Port Commissioners," Citizens/Hannig, the Commission, the Office of the Attorney General and Doe defendants. This complaint deleted some of the more tangential allegations of collusion and alleged a single cause of action to "set aside agreements for violation of city charter; illegal contract; collusion." Madden alleged that Hannig, "Council members" and "Port members" colluded by meeting "to devise a method and manner by which Hannig would be paid, Docktown would be cleared, and the One Marina complex and developer would obtain a walkway under 101 (the underpass) that it had not been able to secure by other available planning methods." Madden alleged "the collusion was to have Hannig sue the City ex rel its Council and threaten to attach the General Fund" so the City "would wrongly assert jurisdiction and state a plausible basis upon which to settle immediately and pay Hannig $1.5 million," whereby Hannig and the developer would recoup funds spent in other litigation against Madden and SFBM.

Demurrers were filed by the City, Citizens/Hannig and the Commission, as was a motion to strike by the Commission, with a hearing set

_____

[5] Madden filed another writ petition in this court on August 20, 2018, challenging the trial court's denial of a jury trial, ruling on both the demurrers and the motion for leave to amend rather than granting leave to amend and finding the demurrers moot, and requiring Madden to plead collusion or fraud, which Madden argued are not required in order to prove an "ultra vires illegal act" in violation of the charter. We denied the petition on August 23, 2018.

9

for October 18, 2018. On October 3, 2018, however, Madden filed a motion for "leave to file fifth amended complaint before demurrer opposition." The proposed complaint alleged a cause of action entitled "Mandamus and CCP Sec. 526a Violation (Illegal Acts)" and added new allegations that "liveaboards are legal and the entire basis for the Hannig settlement is wrong, and knowingly so"; the Commission never voted on questions concerning the legality of liveaboards under the public trust doctrine; the authority provided in the Vogel letter pertained to structures on land, not boats or barges on water; and the letter and position taken by Attorney General and Commission staff constituted "underground rulemaking." Madden alleged that in addition to the collusion underlying the Citizens/Hannig lawsuit and settlement for the purpose of closing Docktown and enriching Hannig, the Council's actions regarding the settlement were "ultra vires (outside its capacity, outside charter jurisdiction) and performing a duty specifically enjoined (lack of jurisdiction given to another body that 'is' the City of Redwood City—to wit the Port and BOPC)," and the Council had no capacity or discretion to "even entertain the defense and settlement of the Hannig Suit."

On October 23, 2018, Madden filed a motion to consolidate the case with an unlawful detainer action the City had filed against her. This motion and the demurrers were set for hearing on November 15, 2018.

On November 15, 2018, the trial court granted the Commission's motion to strike the fourth amended complaint, denying leave to amend because Madden "failed to articulate a viable CCP 526a collusion claim" against the Commission. The court sustained the City's and Citizens/Hannig demurrers to the fourth amended complaint without leave to amend and dismissed the action as to these defendants "because plaintiff has failed to

10

articulate specific facts establishing a viable CCP § 526a collusion claim involving members of the City Council of the City of Redwood City who approved the Hannig Settlement and Docktown Plan ordinances." The court denied Madden's motion to consolidate and denied her motion for leave to file a proposed fifth amended complaint without prejudice to the right to seek leave to file an amended complaint "alleging a viable Mandamus or CCP 526a claim[] against the City of Redwood City, the Port, the State Lands Commission, or the Attorney General."

Madden then filed a motion for leave to file a fifth amended complaint, alleging that the members of the Council that adopted the Docktown Plan "were aware of their lack of jurisdiction, of the Port's possession of such jurisdiction, and did act in concert to enter into an illegal act under the City charter in violation of such jurisdiction (i.e. without capacity or authority) ('collusion')" and that the Commission and Attorney General "participated in a joint effort to bring about the illegal act."[6] New allegations described " 'Charter Revision' Committee meetings" discussing a proposal to change the charter "to provide for the Council to assert oversight and approval control over the Port Dept. for the first time since the City Charter was adopted," which allegedly demonstrated the Council's awareness it lacked jurisdiction over the Port Area.

After a hearing on January 24, 2019, the trial court entered judgment in favor of the defendants. The court denied leave to file the proposed complaint, finding it sought to relitigate claims the court had already ruled upon, as all the substantive relief appellant sought addressed discretionary

---

[6] Madden filed this motion on December 20, 2018, then filed an amended motion on December 24, 2018.

11

acts as to which the court had previously denied relief.[7]  The court reiterated that the defendants' right to sue and be sued included the discretionary right to settle litigation, and found appellant's contention that "some portion of Docktown is physically located outside the geographic area over which the City of Redwood City has jurisdiction" did not establish the City "acted in an arbitrary or capricious manner" either "when it settled litigation naming it [as] defendant and asserting that it was breaching a nondelegable duty as a trustee of public lands by leasing berths to Docktown liveaboards" or "when it exercised its discretion to terminate leases to Docktown liveaboards or bring, or agree to bring, unlawful detainer actions seeking to evict Docktown residents who declined to surrender possession after their lease was terminated."  Noting that it had previously ruled a challenge to discretionary ordinances enacted by the City would have to establish fraud or collusion by the Council members who voted to enact them, the court held "as a matter of law" that the only actions alleged as a basis for fraud and collusion in the proposed amended complaint—voting to approve the settlement of litigation against the City and to terminate Docktown leases and pursue eviction—did not constitute fraud or collusion.

The trial court filed a judgment of dismissal in favor of the City on January 29, 2019.[8]

---

[7] As described by the trial court, Madden requested that the court declare the Docktown Plan and Citizens/Hannig settlement void, order recovery of funds paid pursuant to the Docktown Plan or settlement, enjoin implementation of the Docktown Plan and eviction of residential liveaboard tenants, and order the Port to enter lease agreements with Docktown residences substantially similar to Redwood City liveaboards in other locations.

[8] The judgment of dismissal referenced the court's orders denying Madden's motion for leave to file a fifth amended complaint with prejudice,

Madden filed a notice of appeal on January 23, 2019, and an amended notice of appeal on January 24, 2019.[9]

**DISCUSSION**

"On review [from an order sustaining a demurrer], 'we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose. [Citations.]" (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." ' "

---

sustaining the City's demurrer to Madden's fourth amended complaint without leave to amend, and sustaining the City's demurrer to SFBM's second amended complaint without leave to amend.

[9] On April 24, 2019, Madden filed a "Request for Immediate, Temporary, Emergency Stay of Docktown Plan," which we deemed a petition for writ of supersedeas and denied. The California Supreme Court denied Madden's petition for review and we subsequently denied her petition and supplemental petitions for rehearing.

In January 2020, after failing to file her reply brief on the present appeal by its due date in December 2019, appellant filed an "Advisement of Custody, Request of Oral Argument and for Extension of Reply Briefing," informing the court she was in custody with an expected release date of April 18, 2020, and requesting an extension of time to file the reply brief until May 15, 2020. This request was granted, but the reply brief was not filed by May 15, 2020. On June 11, 2020, Madden filed "Appellant's Post-Custody Advisement, Request for Acknowledgment of Abatement During Covid Order Time Period(s) & for Extension of Reply Briefing & Oral Argument," in which she stated that she assumed our order extending the time for filing the reply brief to May 15, was automatically extended until June 15, 2020, pursuant to this court's April 15, 2020 emergency order extending "time periods specified by the California Rules of Court." Madden asked us to confirm this extension and grant an additional extension to July 15 or, preferably, August 15, 2020. The City opposed Madden's request, and we denied it.

13

(*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010, quoting *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) "If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. ([*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318].) If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. (*Ibid.*) The plaintiff has the burden of proving that an amendment would cure the defect. (*Ibid.*)" (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

## I.

Pursuant to the charter adopted by the City and approved by the State of California in 1929, the "City" refers to the "municipal corporation" known as the City of Redwood City. (Redwood City Charter, § 1.) The City has "all the powers heretofore claimed or exercised by the City" and "all the powers granted to municipal corporations and to cities by the constitution and general Laws of this State together with all the implied powers necessary to carry into execution all the powers granted, and shall retain all rights, interests, powers and privileges heretofore gained by the City or any of its departments, boards, commissions or instrumentalities," and "except as prohibited by the State constitution or restricted by this Charter, the City shall and may exercise all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever." (Redwood City Charter, § 2.) The City's governing body is the Council, which is composed of seven members, including the Mayor, who are elected at municipal elections and subject to recall by the voters. (Redwood City Charter, §§ 6, 9, & 10.)

14

In 1937, the charter was amended to add provisions establishing the "Port Department" as "a department of the City of Redwood City." (Redwood City Charter, § 47.) The "exclusive control and management of the Port Department" is vested in the Board, which has "the complete and exclusive power" and the "duty for and on behalf of the City of Redwood City" to perform specified functions. (*Id.* § 47f.) The five commissioners are appointed by the Council and may be removed by a five-sevenths vote of the Council or recall by the voters. (*Id.* §§ 47a, 47c.) As relevant here, powers and duties of the Board include: "(1) To sue and defend in the name of the City of Redwood City in all actions and proceedings wherein there is involved any matter within the jurisdiction of the Board"; "(3) To take charge of, control and supervise the Port of Redwood City, including all the waterfront properties, and land adjacent thereto, or under water, structures thereon, and approaches thereto, storage facilities and other facilities, and all rights and interest belonging thereto, which are now or may hereafter be owned or possessed by the City of Redwood City"; "(4) To have control and jurisdiction of the area hereinafter defined as the 'Port Area,' and to make and enforce therein general rules and regulations, to the extent that may be necessary or requisite for Port purposes or harbor development and in carrying out the powers elsewhere vested in the Board; provided, however, that with the approval of the Council, the Board may relinquish to the Council control of portions of the said area and likewise, upon request of the Board, the Council may, by ordinance, enlarge the Port Area." (*Id.* § 47f.) The "Port Area" includes "all property fronting on Redwood Creek or its tributary streams, or on San Francisco Bay, lying within Township 5 South, Range 3 West, Mount Diablo meridian, which is now, or may hereafter be, within the City of Redwood City, or owned or possessed by the City of Redwood City, and such

15

other property as may hereafter be placed within said 'Port Area' by the City Council of Redwood City." (*Id.* § 50.)

Madden maintains she properly pleaded a section 526a action by alleging the City's actions regarding Docktown were ultra vires, violating the city charter by assuming jurisdiction the charter gave exclusively to the Port. Madden contends the City lacked authority to settle the Citizens/Hannig lawsuit rather than referring it to the Port, and the resulting settlement agreement, therefore, was void from the inception and subject to challenge by a taxpayer suit. The trial court erred in requiring her to plead facts showing fraud or collusion, Madden argues, because ultra vires action is an independent basis for granting relief under section 526a.

## A.

Preliminarily, the City (joined by Citizens/Hannig) argues the issue of the City's jurisdiction was resolved against Madden in another lawsuit and further litigation is therefore barred by the doctrine of res judicata. The other lawsuit is *Frambrough v. Redwood City* (No. 17CIV04680), filed on October 12, 2017, in which Madden and other Docktown tenants challenged administrative decisions regarding relocation benefits under the Docktown Plan.[10] The Docktown Plan's relocation assistance program allows an individual to appeal the initial determination of eligibility and level of assistance and, if dissatisfied with the resulting hearing officer's decision, file a petition for writ of administrative mandamus. As relevant here, Madden challenged the hearing officer's denial of her claim that the City lacked jurisdiction to issue the Notices of Eligibility, adopt the Docktown Plan and

---

[10] We grant the City's request for judicial notice of documents filed in this and other related cases. (Evid. Code, § 452, subd. (d).)

16

conduct an appeal. The trial court entered judgment in favor of the City on August 1, 2019, and no appeal was taken.

"Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.) "Claim preclusion applies only when 'a second suit involves (1) the same cause of action (2) between the same parties [or their privies] (3) after a final judgment on the merits in the first suit.'" (*Samara v. Matar* (2018) 5 Cal.5th 322, 323, 327 quoting *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813.) "'"The rule is based upon the sound public policy of limiting litigation by preventing a party who has had one fair trial on an issue from again drawing it into controversy." (*Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 811.)'" (*Weikel v. TCW Realty Fund II Holding Co.* (1997) 55 Cal.App.4th 1234, 1245, quoting *Schultz v. Harney* (1994) 27 Cal.App.4th 1611, 1619–1620.)

The issue of the City's jurisdiction to evict Madden pursuant to the Docktown Plan was not decided in case No. 17CIV004680 expressly because the trial court found the jurisdiction issue had been decided in the present case, in which a different judge had denied a preliminary injunction and sustained demurrers without leave to amend after finding the City "had jurisdiction to act."[11] The trial court in case No. 17CIV004680 noted that the hearing officer had refused to take evidence or adjudicate the jurisdiction issue; the petitioners had admitted it was raised in the administrative

---

[11] As described by the trial court in case No. 17CIV00316, the petitioners in that case claimed "'the City does not have jurisdiction to displace them from Docktown because their vessels are not on property controlled by the Council of Redwood City [as] such control being in the independent Port Department by charter.'"

17

proceeding to "exhaust administrative remedies" and "demonstrate futility"; and Madden's argument that the court should stay case No. 17CIV004680 "pending determination on appeal of the 'jurisdiction' case" "reinforce[ed] the fact that this is a duplicative or repetitive claim here, that has already been adjudicated elsewhere."

The City correctly maintains that res judicata bars relitigation "not only of issues that were actually litigated in the prior proceeding, but also issues that could have been litigated in that proceeding" (*Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 82), including claims abandoned in the earlier case (*Gates v. Superior Court* (1986) 178 Cal.App.3d 301, 310 [claims abandoned by not resolving in settlement agreement]), and that res judicata may be raised on appeal when the prior judgment becomes final after the issue could have been raised in the trial court (*Saavedra v. Orange County Consolidated Transportation etc. Agency* (1992) 11 Cal.App.4th 824, 829).

But these points do not help the City. Even assuming the two cases involve the same cause of action and parties, the court in case No. 17CIV004680 refused to address the issue of the City's jurisdiction over Docktown because that issue had been decided in the present case (No. 17CIV00316), which was then pending appeal. Appellant raised the jurisdiction issue in case No. 17CIV004680 and did not abandon it. The City fails to explain how an issue that *was* raised and was *not* abandoned but was specifically left unaddressed by the court because it had been decided in another case that was on appeal can operate to bar consideration of the issue in the appeal to which the court deferred.

**B.**

Section 526a "authorizes actions by a resident taxpayer against officers of a county, town, city, or city and county to obtain an injunction restraining

18

and preventing the illegal expenditure of public funds." (*Blair v. Pitchess* (1971) 5 Cal.3d 258, 267.)  Section 526a "is properly used where 'some illegal expenditure or injury to the public fisc is occurring or will occur.' " (*Humane Society of the United States v. State Bd. of Equalization* (2007) 152 Cal.App.4th 349, 361, quoting *Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1240.)  "[A] taxpayer's action may not be maintained where the challenged government conduct is legal." (*Lyons v. Santa Barbara County Sheriff's Office* (2014) 231 Cal.App.4th 1499, 1503; *Humane Society of the United States,* at p. 361.)  "To invoke taxpayer standing . . . the challenged governmental conduct must be illegal (*Humane Society of the United States, . . .* at p. 361) or must constitute waste, ' "a useless expenditure . . . of public funds" that is incapable of achieving the ostensible goal.' " (*Thompson v. City of Petaluma* (2014) 231 Cal.App.4th 101, 105–106, quoting *Chiatello v. City and County of San Francisco* (2010) 189 Cal.App.4th 472, 482.)  "Waste" may also consist of "outright fraud, corruption, or collusion." (*Chiatello,* at p. 482.)

Madden has not alleged that the City lacked authority to expend funds to settle the Citizens/Hannig lawsuit or to bring Docktown into compliance with the public trust doctrine and policies of the Commission, but rather that the wrong municipal entity—the Council rather than the Port—took these actions.  There is no allegation that the City caused funds to be spent for an illegal purpose, such as to enforce an illegal statute (*Blair v. Pitchess, supra,* 5 Cal.3d at pp. 268–269) or engage in practices contrary to statutory requirements (*County of Santa Clara v. Superior Court* (2009) 171 Cal.App.4th 119, 129 [challenge to practices relating to requests for public records].)

19

As all iterations of the complaints in this case have alleged, Docktown is located within an area granted by the State of California to the City in trust for the people of the state. (Stats. 1945, ch. 1359; Stats. 1954., ch. 34.) That grant was to "the City of Redwood City, a municipal corporation of the State of California." (Stats. 1945, ch. 1359; Stats. 1954, ch. 34.) Pursuant to state law, "[g]ranted public trust lands remain subject to the supervision of the state and the state retains its duty to protect the public interest in granted public trust lands." (Pub. Resources Code, § 6009.1, subd. (a).) The trustee of granted public trust lands has "[t]he duty to not delegate to others the performance of acts that the trustee can reasonably be required to perform and to not transfer the administration of the trust to a cotrustee. If a trustee has properly delegated a matter to an agent, the trustee has a duty to exercise direct supervision over the performance of the delegated matter." (Pub. Resources Code, § 6009.1, subd. (c)(13).)

As described above, the Commission informed the City that the residential use in Docktown violated the terms of the granting statutes and was inconsistent with the public trust doctrine, and, with one exception, the complaints in this case have expressly alleged that the Docktown Plan required the City to bring Docktown into "conformance" with the policies of the Commission.[12]

In other words, the City, as trustee for the public lands granted by the state, adopted a plan to rectify its noncompliance with the terms of that grant as explicated by the Commission. Under section 6009.1, subdivision (c)(13), the City could not delegate its duties as trustee except where it retained

---

[12] The exception is the last proposed fifth amended complaint Madden sought leave to file on December 20, 2018, which did not contain this allegation but, similarly to some of the prior amended complaints, described the Commission as "driving the demand to clear Docktown of liveaboards."

direct supervision over the delegated matter. The trial court held, therefore, that the City's actions in settling the Citizens/Hannig lawsuit and adopting the Docktown Plan were within the City's authority because any delegation of jurisdiction to the Port would either be preempted by state law or subject to the City's direct supervision. A state law on a matter of statewide concern prevails over conflicting provisions of city charter. (*Johnson v. Bradley* (1992) 4 Cal.4th 389, 399–400; *City of Huntington Beach v. Becerra* (2020) 44 Cal.App.5th 243, 271, 273, 277.) No discussion is necessary to establish that the conditions placed by the Legislature on public trust land granted by the state for the benefit of "all of the people of this state" (Pub. Resources Code, § 6009.1, subd. (b)) are a matter of statewide concern.

Madden attempted to avoid the trial court's conclusion by alleging that the Port "is" the City—an independent body, co-equal to the Council, with exclusive jurisdiction over specified areas including the public trust land grant—and that, by virtue of the charter, the Port was the trustee of the public trust land. Beginning with her third amended complaint, Madden alleged the Port " 'is' the City of Redwood City" and "acts 'as the City of Redwood City, by and through its Port Department.' " Subsequent complaints alleged the City is a single entity that acts through two different bodies: "City – *ex rel.* its Council, and/or *ex rel.* its Port – is a municipal entity with the capacity to sue or be sued. It is a charter city under the laws of California." Whereas the first through third amended complaints had named "City of Redwood City" as defendant, Madden's subsequent complaints named "City of Redwood City *ex rel.* (by and through) its Council" and, separately, "City of Redwood City *ex rel.* its Port Department and Board of Port Commissioners." These complaints allege that the Council and the Port are each "co-equal bodies that govern[] the City," created by the charter

"at its inception in 1929," both of which " 'are' 'Redwood City,' " and that each " 'is' the City of Redwood City for actions taken within its charter authority and jurisdiction." The second proposed fifth amended complaint describes the Council and Port as "co-equal 'City' branches of government." In her fourth amended complaint (as well as in the initially proposed fourth and fifth amended complaints), Madden expressly alleged the Port "was always trustee by virtue of the City's 1929 Charter."

These allegations, however, are factually inconsistent with earlier complaints in this case. The first, first amended and second amended complaints allege that the public trust land was granted to the "City as trustee" and then describe the Port as a distinct entity from "the City," alleging that the charter gives the Port exclusive control over the Port Area and that "City is without jurisdiction to enter into agreements or litigation within the Port Area" and "the City is without jurisdiction to enter into either the [Settlement] Agreement or the [Docktown] Plan." The second amended complaint—the first one filed with Madden as a plaintiff—specifically alleged that the Port "is required to report directly to the City per the city charter."

This "direct report" allegation is clearly at odds with subsequent descriptions of the Port as a coequal governing body with no obligation to the Council other than to annually inform the Council and public of the state of its affairs. The fourth amended complaint directly contradicted the direct report allegation by alleging that the Port "is not overseen by the City Council or City Manager," an allegation also included in the third amended complaint and proposed fourth amended complaint and the first of the proposed fifth amended complaints. The second proposed fifth amended complaint alleged the Port "does not report to, nor answer to, the City." And, beginning with the third amended complaint, Madden alleged that the only

22

permissible communications between the Council and the Port are the Port's annual "informational report" to the Council and Council members' public comments to the Board.[13]

Citizens for the Public Trust argues we should reject Madden's allegation that the Port is the trustee of the public trust land granted to the City under the sham pleading doctrine. "[U]nder the sham pleading doctrine, the trial court may disregard amendments that omit harmful allegations in the original complaint or add allegations inconsistent with it." (*Falcon v. Long Beach Genetics, Inc.* (2014) 224 Cal.App.4th 1263, 1281.) "Plaintiffs ' " 'may not discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding, amended pleading,' " ' and 'must explain inconsistencies between the prior and proposed pleadings.' " (*Id.* at pp. 1281–1282, quoting *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 653.) Madden cannot allege the "City," through the Council, is trustee and supervises the Port, then subsequently allege the Port is a co-equal branch of government, does not report to the Council, and was always the trustee, without providing an adequate explanation for her changed factual allegations, which she has never done. (*American Advertising & Sales Co. v. Mid-Western Transport* (1984) 152 Cal.App.3d 875,

---

[13] The limitation on communications was not expressly alleged as a prohibition until the last proposed fifth amended complaint, which alleged that the Council "is prohibited by Charter, akin to a Brown Act enactment, from speaking to the Port Board Commissioners and their professional staff, except in public comments." The prior versions of the complaint alleged, "The Port makes an annual informational report to the Council once a year, council members are able to speak to the Port Commissioners in public comments, and the Port Department: (a) houses and retains all records and maps pertaining to the Port Area, including all granted tidelands; and (b) annually reports to the State Lands Commission the status of the granted lands."

879 ["a proposed amendment which contradicts allegations in an earlier pleading will not be allowed in the absence of 'very satisfactory evidence' upon which it is 'clearly shown that the earlier pleading is the result of mistake or inadvertence' "].)

Moreover, as we have said, the public trust lands were granted to "the City of Redwood City, a municipal corporation." Pursuant to the charter, the governing body of the "municipal corporation" known as Redwood City is the Council. The Port is "a department of the City of Redwood City," and its Board members are appointed, and may be removed, by the Council. These provisions appear to controvert the allegation that the Port, to the exclusion of the Council, is the trustee of the public trust lands.

In any event, " '[t]axpayer suits are authorized only if the government body has a duty to act and has refused to do so. If it has discretion and chooses not to act, the courts may not interfere with that decision.' . . . [Citation.] . . . [Citation.] 'It has long been held that a government entity's decision whether to pursue a legal claim involves the sort of discretion that falls outside the parameters of waste under section 526a and cannot be enjoined by mandate.' " (*San Bernardino County v. Superior Court* (2015) 239 Cal.App.4th 679, 686 (*San Bernardino County*), quoting *Daily Journal Corp. v. County of Los Angeles, supra,* 172 Cal.App.4th at pp. 1557–1558.) It necessarily follows that the decision whether and how to defend against a lawsuit is discretionary. "[G]enerally speaking, a municipality has the power to settle and compromise claims in its favor or against it where there is a bona fide reasonable doubt or dispute as to the validity thereof or the amount

24

due with respect thereto." (*Whitson v. Long Beach* (1962) 200 Cal.App.2d 486, 505.)[14]

The City's authority to enter into the Citizens/Hannig settlement agreement fits comfortably within these principles. The City operates the Docktown Marina, and the Docktown residents' leases are with the City. The lawsuit alleged that the City's operation of Docktown was causing environmental and financial harm. The conduct plaintiffs alleged included the City leasing slips at Docktown for residential use in violation of the public trust doctrine, misappropriating public trust funds, causing dangerous living conditions by failing to invest properly in maintenance, contaminating public trust lands, "white-washing" a report to the county concerning contamination at Docktown, and allowing homeless persons to reside on public trust property near Docktown, thereby making navigation through a portion of the public trust lands unsafe and impractical. The orders sought by the plaintiffs were directed at, and would require, conduct by the City: compelling the City to account separately for revenue and expenses connected to the public trust land underlying Docktown and to cease using revenue generated from leasing public trust lands for uses inconsistent with the public trust doctrine,

---

[14] Citing "Dept. 28 Orders & n. 9," Madden asserts that the trial court erroneously relied on *San Bernardino County, supra,* 239 Cal.App.4th 679 and *Daily Journal Corp. v. County of Los Angeles, supra,* 172 Cal.App.4th 1550 "for the proposition that an entity without jurisdiction may assume it anyway and exercise discretion on behalf of the entity that does have sole and exclusive jurisdiction." Neither the trial court nor the cited cases said any such thing. Madden's characterization is simply an argument as to what she believes the City did in the present case. Contrary to Madden's portrayal, the trial court did not fail to comprehend her argument that the City lacked jurisdiction; it rejected the argument based on the City's role as trustee under the public lands grant and cases such as *San Bernardino County* holding litigation decisions to be discretionary acts outside the scope of section 526a suits.

imposing a constructive trust over the City's general fund, and requiring the City to take actions necessary to allow reasonably safe use of a pedestrian freeway underpass adjacent to Docktown.

Since the City's decision to settle the lawsuit, and its negotiation of the terms of that settlement, were matters of discretion outside the scope of a taxpayer action under section 526a, Madden could prevail only by showing "fraud or collusion on the part of the decision makers." (*San Bernardino County, supra,* 239 Cal.App.4th at pp. 687–688.) "[S]tatutory causes of action must be pleaded with particularity." (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 790.) And, due to the presumption that official duty has been regularly performed (Evid. Code, § 664), a plaintiff must allege "how and in exactly what manner the alleged facts rebut" the presumption. (*Lavine v. Jessup* (1958) 161 Cal.App.2d 59, 67.) In this context, allegations of "fraud, conspiracy, or other acts of misfeasance or of malfeasance" must be pled "precisely" (*ibid.*) or "specifically" (*Lagiss v. County of Contra Costa* (1963) 223 Cal.App.2d 77, 92). "A cause of action for waste of public funds cannot prevail if based upon innuendo and legal conclusions. To present such a case successfully, specific facts alleging a waste of public funds must be supported in the record. (*Hodgeman v. City of San Diego* (1942) 53 Cal.App.2d 610, 619.) Otherwise, public officials performing their duties would be harassed constantly. (*City of Ceres v. City of Modesto* [(1969)] 274 Cal.App.2d 545, 555.)" (*Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288, 310–311.) Absent sufficient allegations of fact, "courts could risk trespassing into the domain of legislative or executive discretion." [15]

_____

[15] Madden relies upon *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47–48, to argue that specificity in pleading is not required because she is alleging collusion, not fraud. That case, referring to

26

Madden's fourth amended complaint contained conclusory allegations that unspecified Council members and Port "members" colluded with Hannig to have Hannig sue the City in order to have the City assert jurisdiction over Docktown and make a $1.5 million payment to Hannig, but failed to allege specific facts showing collusion by the Council members who voted to enter the settlement agreement and adopt the Docktown Plan. The proposed fifth amended complaint alleged only that the Council members who adopted the Docktown Plan were aware they lacked jurisdiction and the Port had

---

fraud as "the only remaining cause of action in which specific pleading is required to enable the court to determine on the basis of the pleadings alone whether a foundation existed for the charge," held general allegations of agreement were sufficient to state a cause of action for conspiracy in restraint of trade. (*Id.* at p. 47.) The case did not consider pleading requirements in the context of a taxpayer suit alleging fraud or collusion to contest an otherwise unreviewable exercise of a municipality's discretion and therefore does not cause us to depart from the analysis of more on-point authorities.

*Gilbane Building Co. v. Super. Ct. (San Diegans for Open Government* (2014) 223 Cal.App.4th 1527 (*Gilbane*), which Madden cites for the rule that "illegal contracts may be voided by taxpayer 526a suits," does not assist her. Madden notes the *Gilbane* court's statement that "[w]hether the contracts are void is not a matter within the District's discretion." (*Id.* at p. 1533.) The taxpayer suit in that case challenged contracts made by a school district as violating Government Code 1090, which prohibits members of a district from having a financial interest in contracts made in their official capacity. (*Id.* at pp. 1530, 1532.) A contract made in violation of Government Code section 1090 is void. (*Gilbane,* at p. 1532) *Gilbane* noted that "[i]f the governing body has discretion in the matter, the taxpayer may not interfere" (*ibid.*), but in claiming violations of Government Code 1090, the taxpayers were "not seeking to usurp the District's discretion in managing its affairs. Rather, if the allegations in [the plaintiffs'] complaint are true, the District expended funds illegally and the subject contracts are void, not merely voidable. Whether the contracts are void is not a matter within the District's discretion." (*Gilbane,* at p. 1533.) Here, unlike financial interest—which, if true, necessarily voids the governmental body's contract—settlement of a lawsuit against the City was a matter within the City's discretion.

27

jurisdiction, and acted "in concert to enter into an illegal act under the City charter in violation of such jurisdiction."

Nor has Madden alleged any facts showing the actions the City agreed to undertake in the settlement and Docktown Plan were improper. Instead, the complaints acknowledge the City was responding to the Commission's directive that the residential use at Docktown violated the public trust doctrine. Madden did not allege the Port would not have complied with the Commission's policy if it had acted in place of the Council, or that it *could* have acted in place of the Council, given that the City was in fact operating Docktown and the lawsuit sought, among other things, an accounting from and other orders relating to the City's general fund. Madden's assertions in her brief on appeal as to how the Port would have handled the Citizens/Hannig lawsuit differently are entirely speculative.

In sum, we find no fault in the trial court's conclusion that Madden failed to state a viable section 526a claim against the City despite her numerous attempts to do so. The trial court did not abuse its discretion in sustaining the demurrers without further leave to amend.

## II.

Madden argues the trial court erred in striking the fourth amended complaint as to the Commission, as the court had directed her to name and serve the Commission, the Commission had been named as a defendant since former counsel converted a Doe defendant (in July 2017), and the fourth amended complaint sufficiently alleged the Commission participated in the ultra vires conduct of the City by sending the City the Vogel letter and representing it as an opinion of the Attorney General.

Madden's first point is based on the court having ruled that the Commission was an indispensable party with respect to the cause of action

28

for declaratory relief in the first amended complaint. That cause of action sought adjudication of Docktown residents' rights with respect to the Commission's interpretation of the public trust doctrine, and the court held no judgment would be enforceable against the Commission unless it was a party to the action. It does not follow, however, that the Commission necessarily remained an indispensable party. The fourth amended complaint did not seek declaratory relief against the Commission. The primary relief sought was for the court to set aside the settlement agreement and Docktown Plan and make various orders concerning the respective jurisdiction of the Council and the Port. The only relief sought as to the Commission was for the court to clarify, or order the Commission and Attorney General to clarify, that the Vogel letter was not an official opinion of the Attorney General. Whether this was sufficient to make the Commission an indispensable party is a separate question from that presented to the court in the first amended complaint.

Madden's argument that the Commission had been named a defendant since July 2017 is incorrect. As earlier described, former counsel for SFBM and Madden added the Commission in place of a Doe defendant in the second amended complaint. When Madden filed the third amended complaint, however, she did *not* name the Commission as a defendant. "It has long been the rule that an amended complaint that omits defendants named in the original complaint operates as a dismissal as to them." (*Fireman's Fund Ins. Co. v. Sparks Construction, Inc.* (2004) 114 Cal.App.4th 1135, 1142.) In apparent accordance with this rule, Madden then sought leave to file a fourth amended complaint adding the Commission and the Attorney General as defendants; Madden stated, among other things, that she did not agree the Commission was a necessary or indispensable party and "regretfully names

and serves [the Commission] solely under Court order." After the court denied leave to file this proposed complaint, Madden filed her fourth amended complaint, which again stated that it "adds parties and causes of action based on prior rulings of the court, without limitation the Cal. State Lands Commission . . . ." The proposed and filed fourth amended complaints thus acknowledged that the Commission was not a named defendant under the third amended complaint, as does Madden's brief in this court, which states that the fourth amended complaint "added parties the court contemplated."

Madden argues that the fourth amended complaint sufficiently alleged the Commission "contributed to the *ultra vires* conduct (indeed bringing it about) by sending the 'Vogel Letter' and characterizing it as an AG Opinion, an unlawful act." She then emphasizes the significance of the Vogel letter as the City's impetus and justification for entering the settlement agreement and adopting the Docktown Plan. She maintains the letter is "invalid" and "legally impermissible," and was mischaracterized by the Commission as an official opinion of the Attorney General (see Gov. Code, § 12519) entitled to "great weight and deference" when in fact it was merely an informal legal advice of counsel letter.

Madden does not explain how her allegations stated a cause of action against the Commission. The cause of action alleged against all the defendants was "to set aside agreements for violation of City charter; illegal contract; collusion." The claims of charter violation and illegal contract pertain only to the City and Hannig parties, not the Commission. The trial court found the fourth amended complaint "failed to articulate a viable CCP § 526a collusion claim" against the Commission. Madden's contention in her appellate brief that the Commission "participated in procuring" or

30

"contributed to" the alleged *ultra vires* act of the City is not supported by any reference to factual allegations of collusion engaged in by the Commission.

" ' "Collusion has been variously defined as (1) 'a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third party of his right'; (2) 'a secret arrangement between two or more persons, whose interests are apparently conflicting, to make use of the forms and proceedings of law in order to defraud a third person, or to obtain that which justice would not give them, by deceiving a court or its officers'; and (3) 'a secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purposes.' [Citation.]" [Citation.]' " (*Andrade v. Jennings* (1997) 54 Cal.App.4th 307, 327, quoting *Span, Inc. v. Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463, 484.)

The only factual allegations concerning the Commission in the fourth amended complaint relate to the Vogel letter:  Madden alleged that mischaracterization of the letter as "an 'official' Attorney General opinion" "drove the Hannig suit and Settlement and is the foundational error on which all of the preceedings and proceedings have evolved."[16]  The only alleged act of mischaracterization, however, is that "[c]ounsel for Citizens [for the Public Trust] in the present case represented to this Court at Case Management (Foiles, J.) in its CMC Statement that the Vogel Letter is an 'official' Attorney General opinion."  The allegations concerning the Commission and its staff

---

[16] As the Commission points out, the cover letter referenced in the fourth amended complaint, by which the Commission transmitted the letter to the City, referred to "an opinion letter from the Attorney General's office to the Commission," not to an "official," "formal" or "published" Attorney General opinion.

are that they refused to comply with Madden's requests to correct mischaracterization of the letter.

Putting aside the absence of factual allegations as to how and when Commission staff mischaracterized the letter, as well as the question whether the alleged mischaracterization can be viewed as "illegal conduct," as Madden claims, the fourth amendment contains no allegations that the Commission entered into a deceitful or secret agreement with the City or Citizens/Hannig for fraudulent or deceitful purposes. The collusion Madden alleged was between "Citizens [for the Public Trust], the developer of the property across from Docktown, former or current elected and/or appointed officials, agents, personnel and representatives of the City, and other monied interests (current landowners, prior and current potential developers of the Docktown uplands, and those named as potential DOE conversion defendants), all of whom colluded to bring about the lawsuit by Citizens [for the Public Trust], and to settle it without answering" and "award $1.5 million to Hannig, all to set up the closure of Docktown and enrich Hannig and the associated developer and owner monied interests and Hannig's life partner," and to obtain an underpass the developer had not been able to secure. Madden alleged that the Vogel letter was "part and parcel of the collusion of all parties to set up the illegal act of Council to obtain unlawful settlements" and the refusal of Commission staff members to comply with Madden's requests to recharacterize and clarify the nature of the letter "support[ed] the allegations of collusion." She did not, however, allege any facts showing that the Commission's characterization of the letter or responses to Madden's

32

requests involved concerted conduct that was secret, deceitful or undertaken for fraudulent purposes.[17]

We find no error in the trial court's ruling that Madden failed to state a viable claim against the Commission.[18]

### III.

Madden's remaining contentions require little discussion. Madden contends the trial court erred in dismissing SFBM for failure to properly allege taxpayer standing, but she cannot assert this contention on SFBM's behalf. SFBM did not file a notice of appeal and is not a party to this appeal. "An appellant cannot urge errors that affect only another party who does not appeal." (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1134.)[19]

---

[17] Madden made clear at the hearing on the Commission's motion to strike the fourth amended complaint that she never intended to state a section 526a claim against the Commission and in fact never wanted to sue the Commission, but did so only in response to the court's orders and with respect to her claims that "liveaboards are not illegal." Madden told the court, "I actually don't really have a problem with the state lands commission not being in this case, but I want to make it crystal clear that I'm not the one who had a lawsuit strategy to bring them in. . . . I don't have a problem dismissing the state lands commission . . . I never wanted to sue them. I don't think they're necessary or indispensable. . . ."

[18] As the Commission points out, Madden has not challenged the trial court's order denying her motion for leave to file a fifth amended complaint as to the Commission. Accordingly, she has forfeited any challenge to that order. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.)

[19] In a petition for writ of mandate filed on February 27, 2018, which we denied, Madden challenged the dismissal of SFBM and other issues, stating that she was representing SFBM, as well as herself. To our knowledge, however, the only substitution of attorney form in the record is for Madden alone, substituting herself in propria persona in place of the attorney who had previously represented her and SFBM. Moreover, Madden was suspended from practicing law as of December 1, 2019, and therefore cannot represent SFBM unless and until she becomes eligible to practice law.

33

Given our conclusion that Madden failed to properly state her claims against the City and the Commission in this case, we need not consider her contention that the trial court erred in denying her motion to consolidate it with the unlawful detainer action or denied her right to a jury trial.[20]

## DISPOSITION

The judgment is affirmed.

Costs to respondents.

---

[20] Commission joined the other respondents' arguments.

 

                              _____

                              Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.

*Madden v. City of Redwood City et al.* (A156288)

35